### No. 8852.

### ADAMS *v*. GUIRAUD.

Decided December 3, 1917.

Action for conversion of personal property. Judgment for plaintiff.

*Reversed.*

1. CONTRACT—*Rescission*—*Burden of proof.* One party to an executory contract, in the absence of fraud or special reason, can not rescind. To rescind by agreement, the agreement must be mutual and by all the necessary parties to the original contract. The burden of proving the agreement is upon the party alleging it.

2.      *Contract of Sale*—*Essentials.* The necessary essentials of a valid contract of sale of cattle are: 1. Certainty as to parties; 2. . Sufficient certainty as to property; 3. Price; 4. Time, place and manner of payment; 5. Time and place of delivery, if delivery be agreed upon.

3. INSTRUCTIONS—*Issues.* Instructions should confine the issues to the facts in the case, and should not contain conclusions or assumptions not warranted by the evidence.

*Error to the District Court of the City and County of Denver, Hon. Granby Hillyer, Judge.*

Messrs. ALLEN & WEBSTER, for plaintiff in error.

Mr. J. W. KELLEY, for defendant in error.

*En banc.*

MR. JUSTICE SCOTT delivered the opinion of the court.

THIS is an action brought in conversion. Briefly the facts are that in the spring of 1915, the plaintiff placed an order with defendant for the purchase of approximately 500 head of cattle. Thereafter defendant sold a lot of cattle undetermined in number, but thought at the time to number from 400 to 500 head, and known as the Pugh herd, then being on the ranches of the Pugh estate. This sale was to a partnership known as Smith & Hanks, and the

sale was for the definite price of $62.50 per head. These cattle, the number of which was still undetermined and upon the said ranches, was purchased by the plaintiff through the agency of the defendant, at the fixed price of $65.00 per head. Later on these cattle with the exception hereinafter referred to, were sold by the plaintiff, the number still undetermined, and the cattle still running on the said ranches, for the sum of $67.50 per head.

It is contended by the defendant that prior to this latter sale, the plaintiff contracted to sell to the defendant 50 head of cattle, purchased by him, being of an inferior class and designated as "tail-enders", and that at the time of the sale to Gray & Cobb, the defendant was entitled under said contract of purchase, and upon payment on delivery to the said 50 head.

The plaintiff contends that this agreement of sale by him to the defendant was, prior to the sale of the entire lot, rescinded, and that therefore the plaintiff was entitled to receive the profit on the 50 head, being the difference between the sum of $55 to be paid under the agreement of purchase, and the sum of $67.50 received for all the cattle, or the total sum of $625. Both lots were sold at the same time and to the firm of Gray & Cobb.

In the complaint the plaintiff alleges that of the moneys received by the defendant for all cattle sold, the defendant fraudulently and wrongfully appropriated to his own use and benefit, the said sum of $625, which he has refused to pay over to the plaintiff, and also prayed for $1,000 as exemplary damages. The answer denied generally the allegations of the complaint as to the wrongful withholding of the money, and offered proof of the agreement with plaintiff, as a defense. None of the cattle were ever specifically selected, separated or counted out, until after the final sale to Gray & Cobb.

That such a contract was entered into between the plaintiff and defendant for the sale of 50 head of cattle at the fixed price of $55.00 per head is not disputed. Plaintiff admits the following letter:

"Garo, Colo., May 29, 1915.

Mr. J. P. Adams,
        Denver, Colo.

Friend Joe:

I think you can sell all of that bunch of cattle out at Stratton for $70.00 per head, as you get 50 dry cows at $55 per head, and I don't want to sell any more of these cattle for less than they cost me as the freight on the rest will make pretty high priced cattle for me. Now, get busy and sell 150 head of them besides the 50 head that you get, and if you can get a chance to sell all of them at $70.00 per head on cars at Stratton; cut loose and sell them. Now, get to work on them, and some of them, as there is sure to be a lot of cows and calves in the 150 head. I will be on hand the 13th so we can go to Stratton on the 14th. Now let me hear from you and sell this stuff so I won't lose money on them. I want to sell two hundred or all of them. Write soon and let me know, as I leave for Fountain about the 4th of June.

Yours very truly,
(Signed)    H. L. GUIRAUD."

It appears that the defendant had negotiated a sale for the entire lot of cattle including the 50 head, and that thereupon and on the 11th day of June, 1915, he called the plaintiff over the telephone, and in a conversation, says he told the plaintiff that he had an offer on the entire lot of cattle at $67.50 per head; that the plaintiff replied that he thought that they ought to bring $70.00; that defendant said that he could only get $67.50, and that the plaintiff then authorized the defendant to sell the cattle at the price offered. The plaintiff admits this conversation, but says that in addition, he asked the defendant Adams, if the price was for all the cattle; and that Adams replied, "All of those cattle, they are all yours, I am out of it."

Mr. Gray, one of the firm purchasing the cattle, testifies that he held one receiver on the same phone, and overheard what both men said during the conversation, and that

Adams did not say to plaintiff that "they are all yours, I am out of it." And that no such language was used in the conversation. Adams testifies that he did say that the question of price was up to the plaintiff. Also the defendant's bookkeeper testifies that he sat at the desk near the telephone and heard all that Adams said, and confirms the testimony of both Adams and Gray to the effect that Adams used no such language as that testified to by the plaintiff, to the effect that "they are all yours, I am out of it."

It is the plaintiff's contention that this language which he says Adams used at that time, constituted a rescission of the contract between plaintiff and defendant, and thus reinvested the title to the 50 head of cattle in himself. So that the agreement to sell the 50 head of cattle is conceded, and the matter to be determined in this respect is as to whether or not this alleged language of Adams and the acquiescence therein by the plaintiff, constituted a rescission of the contract. This appears clearly to have been the understanding of the court for in Instruction No. 3, the court states the issue as follows:

"Instruction No. 3. Plaintiff claims his agreement with J. P. Adams was to sell him fifty head of the poorer cattle, known as 'tail-enders,' at $55 a head, separation and delivery of said 50 head, to be made at a time when plaintiff was to receive the cattle bought by him, and that this sale was never carried out by either party, but was mutually rescinded, and all the 414 head sold together for $67.50, without any of the tail enders being taken out. The defendant claims these fifty cattle were to be sold to him and were sold to him without and regardless of any of these conditions."

It will be seen that Adams and the two witnesses who heard all that Adams said in the conversation, denied flatly that he used the language testified to by the plaintiff.

If we are to concede the testimony of plaintiff as being true as to the use of these general words, "they are all yours, I am out of it," yet, under all the facts and circumstances theretofore and then existing, this did not prove a

rescission of the contract then existing between plaintiff and defendant. In this conversation, there was no specific reference to such contract, and no reason was suggested for rescinding the same. The 50 head of cattle included in the contract are not mentioned, nor is any reference made thereto.

Nothing is better settled than that one party to an executory contract, in the absence of fraud or a special reason, cannot rescind. To rescind by agreement, the agreement must be mutual, and by all the necessary parties to the original contract. Such rescission must be with the clear knowledge and understanding of the parties. The same degree of proof of rescission will be required as in case of proof of the contract alleged to have been rescinded. The burden to prove an agreement to rescind, is upon the party alleging it.

If we are to admit that Adams did use the language contended, what are the surrounding facts and circumstances which may tend to throw light upon the intent and meaning? There is no evidence of any act or desire upon the part of Adams to rescind his contract prior to that time nor afterward. Plaintiff still owned as finally determined, 364 head of cattle aside from the 50 head contracted to Adams, and for which the latter was acting as agent in the sale. It was the former number that plaintiff had to sell. The purpose of the telephone call was to learn whether or not plaintiff would accept the price offered for his cattle, not for the cattle which Adams held under his agreement. It was not necessary under that agreement, for Adams to ask plaintiff for consent to any price for which he should sell the cattle purchased under his contract. Naturally, without express declaration to the contrary, he could have in mind only, "All of plaintiff's cattle." It was under such circumstances, very natural for Adams to say, "the price is up to you", "they are your cattle", and even "I am out of it", without having the slightest intent or thought of referring to the 50 head, for which he had the agreement of purchase and sale to himself. In the absence of some proof

of such intent and purpose on the part of Adams, it cannot be inferred from the expression said to have been used, he intended to or did, declare his contract rescinded. Clearly there was no sufficient proof of rescission.

It may be stated that the number of cattle taken by Gray & Cobb, was 414 head. It is clear that under the undisputed facts in this case plaintiff cannot recover in conversion. His right to recover at all depends wholly upon the validity of the contract as between himself and the plaintiff, and whether or not that contract was rescinded prior to the sale to Gray & Cobb.

It is further contended in the argument that this contract is void for the reasons (a) that the 50 head of cattle were not separated, counted out, nor identified, and (b) that the contract was within the statute of frauds. The jury was instructed upon this point as follows:

"Instruction No. 5. The jury is instructed that there is a difference between the sale of personal property and an agreement to sell; under a mere agreement to sell no title passes; but where parties have agreed upon the terms of sale and the precise property sold is identified and nothing remains to be done but to deliver it, and it appears from the evidence that the parties understood and intended the title to pass without actual delivery, then the title will pass without such delivery; but where anything remains to be done by way of selecting out or separating the property from other property of similar kind for the purpose of identifying the property sold, then no title will pass until the property has been so selected and identified.

Instruction 6. The court instructs you that in sales of personal property there must be a delivery of the property before the ownership passes from the seller to the buyer, that is to say, the mere agreement of one person to sell and the other to buy a certain number of a certain kind of cattle out of a herd made up of cattle with different grades and values at a certain price, does not constitute a sale of the animals until the ones to be taken are identified and distinguished in some way from the rest; and if you believe

from the evidence that at no time did the plaintiff, or J. P. Adams, or either of them, identify the fifty head to be taken by Adams, then there was no sale of these fifty head and your verdict must be for the plaintiff."

These instructions were objected to by the defendant, who at the time tendered instructions, which were refused, the substance of which at least should have been given, to the extent of confining the issues to the facts in the case, and thus relieving them from the objectionable features. It is the qualification to Instruction No. 5 of which complaint is made, namely: "But where anything remains to be done by way of selecting out or separating the property from other property of a similar kind for the purpose of identifying the property sold, then no title will pass until the property has been so selected and identified."

Without instruction as to what constitutes a sufficient selection and identification, under the circumstances of the case, the jury must have construed this part of the instruction to require an actual physical separation. Such a separation was never made nor had in the case of the sale from plaintiff to defendant, nor in case of either of the sales preceding the last one, when the 414 head was cut out and delivered to the last purchaser. This qualification seems to nullify the preceding declaration, which declared "but where parties have agreed upon the terms of the sale, and the precise property sold is identified and nothing remains but to deliver it, and it appears from the evidence that the parties understood and intended the title to pass without actual delivery, then the title will pass without such delivery."

The question here is: Do the facts in this case make the sale valid under this declaration of the law? It is held to be the rule that the essentials of a contract of this character, necessary to its validity, are: First, certainty as to parties; second, sufficient certainty as to the property; third, the price; fourth, the time and place and manner of payment; fifth, time and place of delivery, if such delivery was agreed upon. Here we have the certainty as to

parties; the certainty as to price; certainty as to the number of cattle, and testimony showing the time of delivery to be, when the herd were finally disposed of, and also that the time of payment was to be as of the time of delivery.

As to the identity of the property the plaintiff testifies:

"Q.   When you looked at these cattle, did you notice any fifty?   A.   Yes, sir.

Q.   That were worse than the others?   A.   Yes, sir.

Q.   There were fifty that were markedly worse than the others?   A.   Yes, sir.

Q.   Go on and describe to the jury how cattlemen who make such an agreement has to determine which are the tail-enders and which are not.   A.   A man goes into a herd of cattle, he can very easily tell the tail-enders, if he is used to cattle at all.   *   *   *   They go in and cut out the tail-end cattle or poor cattle, the cattle that do not look as well as the rest, and the old cattle, the cattle that are undersized."

The trial court understood and stated that the plaintiff's claim under the contract, was that there should be separation and delivery of 50 head so agreed to be sold, at the time of delivery.   This being stated in instruction number three.   In addition to this the plaintiff in his letter to Adams described the cattle which defendant was to receive, as "50 dry cows at $55 per head, of the bunch of dry cattle at Stratton."   In our opinion the evidence is sufficient for identification to take the contract out of the statute of frauds.

In the very exhaustively considered case of *Darnell v. Lafferty,* 113 Mo. App. 282, 88 S. W. 784, the following memorandum was held to be sufficient both as to identity, and to take the contract out of the statute of frauds:

"Vandalia, Mo., June 11, 1903.

This is to certify that I, the undersigned, have this day bought of F. L. Darnell, ten head of cows and heifers to be weighed at Curryville, Mo., on August 11, 1903, with three per cent off at three and one-half cents per pound.

(Signed)   MARTIN LAFFERTY."

See also *Am. Iron and Steel Co. v. Midland Street Co.,* 101 Fed. 200; *Penniman v. Hartshorn,* 13 Mass. 87.

The court gave other instructions that had no place in the case, and which clearly tended to either mislead the jury, or to constitute positive error.

In Instruction No. 9, among other things, the court instructed the jury:

"The rescission and setting aside of a contract need not be evidenced by words; it may be by acts alone; and to ascertain whether they did so mutually rescind the contract, if you find there was a contract, you may take into consideration all the facts and circumstances shown by the evidence."

The plaintiff neither testified to nor relied on any act of defendant to prove a rescission. The sole reliance of the plaintiff was on the alleged words of defendant in the telephone conversation. The instructions should have been so confined.

In Instruction No. 10, the jury was instructed as follows:

"The court instructs the jury that when persons enter into a contract and one of the parties decides to rescind it and so informs the other, then the other party is no longer bound to carry out any part of the contract; the law does not require a useless act; and if you believe from the evidence that Adams informed the plaintiff, Guiraud, that he was no longer interested in purchasing fifty head of the cattle at $55 a head, then the plaintiff was not obliged to carry out any part of the agreement to sell, if there was an agreement, and was not bound to separate, or offer to separate, from the others the fifty head of cattle, or offer them to Adams, but might treat the animals as his own and sell them to whomever he pleased."

The first paragraph of this instruction is a clear misstatement of the law. Rescission requires the agreement of both parties as does the making of the contract, in whatever manner this may be done; but both must agree. There was no justification for the court in this instruction to say that if "Adams informed Guiraud, that he was no

longer interested in purchasing fifty head of the cattle at $55 a head, then plaintiff was not required to carry out the contract." Plaintiff does not say that any such language was used.

The court thus expressly construed the alleged words of defendant, to constitute a specific rescission of the contract, when nowhere in terms, is the contract suggested or referred to.

We cannot enter upon a consideration of all the instructions complained of, but Instruction No. 12, was as follows:

"The law looks with suspicion on all transactions in which an agent secures a secret profit in a sale at the expense of his principal and it requires the agent to show to the satisfaction of the jury that the transaction was open and known to the principal and that the principal consented to the agent securing a profit from it. So if you believe from the evidence that not only The Western Live Stock Commission Company, but also the defendant J. P. Adams, was an agent of the plaintiff in the sale of these cattle, and that Adams, unknown to the plaintiff, and not in good faith, led plaintiff into a transaction whereby Adams could secure a profit at plaintiff's expense on fifty head of the cattle sold to Gray & Company, then, in such case, your verdict must be for the plaintiff as an agent must act solely in the principal's interest unless his profit is made with the principal's consent."

This instruction was highly prejudicial. There is no evidence of a secret profit, and no such claim in the case. The claim is based upon the alleged rescission of a contract. There was no question of agency involved in the particular agreement. There was no testimony to indicate that "Adams, unknown to plaintiff, and not in good faith led plaintiff into a transaction whereby Adams could secure a profit at plaintiff's expense."

The agreement of sale between plaintiff and defendant was made about two weeks before the final sale to Gray & Cobb, and before it was known to whom or at what price the remainder of the cattle were to be sold, and no restric-

tions as to whom, when, or at what price Adams should sell the fifty head, or that he should sell them at all. The only questions possibly involved in this suit are whether or not the contract was valid, and if so, was it rescinded.

The judgment is reversed.