(No. 27825.—

THE PURE OIL COMPANY *et al. vs.* JAMES LAWRENCE BYRNES *et al.*—(JAMES LAWRENCE BYRNES, Appellee, *vs.* THE PURE OIL COMPANY, Appellant.)

*Opinion filed Sept. 19, 1944—Rehearing denied Nov. 16, 1944.*

28

SMITH, McCOLLUM & RIGGLE, of Flora, VINSON, ELKINS, WEEMS & FRANCIS, of Houston, Texas, and BEN A. HARPER, of Chicago, for appellant.

THOMAS H. FITTZ, of Indianapolis, Indiana, and ALBERT E. ISLEY, of Newton, for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Appellant, Pure Oil Company, seeks, by this appeal, to reverse a decree of the circuit court of Jasper county, by which the court cancelled an oil lease executed by appellee, James Lawrence Byrnes, and Sam B. Raitman. The decree also required appellant to account to appellee for his one-fourth interest in the oil produced on the premises involved, after deducting the expenses of drilling, producing and marketing the oil, the cost of an equity proceeding by appellant as the holder of a majority of joint interests in the land, and the sum of $3700 paid by appellant to Raitman for the lease. Appellee is endeavoring to sustain the decree insofar as it cancels the lease, and by cross errors assails that portion of the decree which allows a deduction of the $3700.

The forty acres of land involved in the litigation was owned by John Riley Byrnes, who died February 9, 1894, leaving four children, one of whom was appellee, as his

only heirs-at-law. His estate was never administered. Appellant, in 1940, obtained a lease from all the heirs except appellee, whose whereabouts was then unknown. On December 23, 1940, appellant, as owner of a majority of joint interests in said land, filed an equity proceeding in the circuit court of Jasper county under the provisions of the act of 1939 in relation to oil and gas interests in land, (Ill. Rev. Stat. 1943, chap. 104, pars. 25-33, incl.; Laws of 1939, p. 805,) for permission to drill for and produce oil and gas to protect said joint interests from being drained by wells on adjoining premises.

On February 27, 1941, a decree was entered granting appellant such permission and ordering it to account for and pay into court for the use of appellee and his wife, if any, all sums of money received from the sale of one fourth of the oil produced, if any, in excess of one fourth the cost of the law suit and of drilling, completing, maintaining and operating said well or wells and of marketing the production. Immediately thereafter appellant drilled one producing and one nonproducing well. Four monthly reports were filed with the court but no action was taken, by the court, on said reports.

On December 10, 1942, appellee filed a petition in the aforesaid proceeding in which he alleged his ownership of a one-fourth interest in the northwest quarter of the southwest quarter of section 8, township 5 north, range 10 east, in said county, being the same tract involved in the original proceeding; the entering of the decree granting permission to appellant to enter upon and produce oil from said premises; the producing and marketing of large quantities of oil; that there was due petitioner from the proceeds thereof, as of July 31, 1941, the sum of $2241.79, after allowing to appellant the statutory deductions set forth in the decree; that appellant had not reported the amount since July 31, and that there was then due from appellant to appellee in excess of $10,000. Appellee prayed

for an accounting and that his rights in and to the wells, equipment and personal property attached to and used in connection therewith be fixed.

Appellant answered, averring that by reason of an oil and gas lease executed and delivered by appellee and S. B. Raitman, on September 22, 1941, to M. T. Peyton, and duly recorded, appellant was relieved of any obligation to operate the leasehold estate according to the terms of the aforesaid decree and was relieved from paying appellee any amount except his proportionate part of the one-eighth royalty provided in said lease. It was also alleged in the answer that appellee, on September 20, 1941, executed and delivered to S. B. Raitman a mineral deed by which appellee conveyed to him a one-eighth interest in and to all the oil, gas and other minerals under said land; that said deed was recorded in Jasper county; that on September 20, 1941, appellee also executed and delivered to said Raitman an oil and gas lease on said premises, which was never recorded, but was lost or destroyed; and that by reason of said instruments M. T. Peyton took legal title to the leasehold estate conveyed to Raitman and to the leasehold estate conveyed by appellee and Raitman to him on September 22, 1941. It is then averred that M. T. Peyton was the nominee of appellant and took the lease as a dry or passive trust for the use of appellant so that the legal title thereto passed to appellant; that appellant paid to appellee and Raitman the sum of $3750 for said lease; that Peyton and his wife assigned said lease to appellant; that said lease contained a retroactive provision by which it was made effective, as to minerals produced and moneys accruing to the lessors therefrom, as of February 15, 1941, as if the lease had been entered into prior to any production of oil from said land; and that by virtue thereof appellee relinquished any right that he might have had theretofore to have any money paid to him by virtue of the court decree of February 27, 1941, and was not en-

titled to recover anything except what had accrued under the royalty provisions of said lease, which amounted to $2293.67 as of November 30, 1942, which appellant offered to pay, and to account for all future payments of royalty under the lease.

With the answer appellant filed a cross petition re-alleging the facts set forth in the answer and adding thereto that by reason of said mineral deed and leases appellee is estopped to claim under the decree of February 27, 1941; that said decree was superseded thereby and that said decree and the claims of appellee thereunder constitute a cloud on the title of appellant to the oil and gas leasehold. Appellant prayed to be relieved from any obligation to appellee under said decree; that the decree be set aside or modified; and that appellant's title under the said lease be established and confirmed.

Appellee replied to the answer and answered the cross petition, alleging, in substance, that S. B. Raitman obtained the mineral lease by fraud and deceit and procured appellee's signature thereto while appellee was drunk; that on September 27, 1941, he filed suit in the circuit court to set aside the mineral deed and lease to Raitman and that they were cancelled on August 19, 1942; that if any oil lease was obtained by Raitman it was through fraud, deceit, concealment and misrepresentations, and while appellee was drunk; that if such a lease was ever executed it was cancelled and destroyed by both parties so as to revoke it; and appellee denied executing and delivering the lease to Peyton. In his answer to appellant's cross petition appellee also averred, in substance, that appellant, as trustee of funds belonging to appellee, conspired with S. B. Raitman to obtain appellee's signature to the lease of September 22, 1941, and by concealment of material facts, of which appellee was ignorant, and by false representations, secured for itself and for its benefit the said trust property. Specific acts of fraud and concealment

are alleged by which the lease, with the retroactive effective clause included, was obtained. His answer to the cross-petition concluded with a prayer for a cancellation of the lease to Peyton; a setting aside of the assignment thereof to appellant; and an accounting according to the prayer of his original petition.

Appellant then replied to the answer to the cross petition and pleaded estoppel on the ground that appellee's counsel had assured appellant's representatives that the lease was not to be attacked and that relying on such assurance appellant had paid Raitman $3700 for the lease; and for the further reason that appellee had never asserted his intention to avoid the lease within a reasonable time after learning the facts on which he relies for rescission, but delayed bringing suit until December 10, 1942, and during the delay Raitman had become a bankrupt so that it was impossible to recover the amount paid him, which could have been done had appellee proceeded with diligence to assert and adhere to his decision to avoid the lease.

On the issues thus raised evidence was heard, and the only issues now before this court are: (1) Was appellant, by reason of its relation to appellee as tenant in common of the oil in the common inheritance, a constructive trustee of appellee's interest and thereby obligated to make a full disclosure of the existence of a producing well and of the amount of money on hand to appellee's credit before accepting the lease in question; (2) did appellant's representatives participate in the fraud and deceit practiced by Raitman; (3) was appellee estopped by _laches_ and the conduct of his attorneys from rescinding the lease; and (4) is it equitable to allow appellant to deduct the $3700, paid to Raitman, from the amount distributable to appellee?

The proof discloses that Raitman offered a reward and thereby located appellee, who was taken to Chicago,

on September 20, 1941, by one Lester Schomas, to meet Raitman, who paid their fare and paid Schomas $50 for his efforts. The three went to Raitman's room in the Palmer House, where whiskey was served and Raitman informed appellee that he was a lawyer who would help appellee recover his interest in his father's estate. As a result of their first meeting on the morning of September 20, 1941, Raitman obtained from appellee a "fifty-fifty" contract of employment to act as appellee's attorney. He also obtained from appellee a mineral deed to a one-eighth interest in the oil and gas and other minerals underlying said forty acres, and procured divisional orders showing Raitman entitled to receive one half of the funds due and to become due appellee from appellant. Raitman did not disclose to appellee that there was a producing oil well on the premises nor that there had been a well in operation for several months with a substantial sum on hand belonging to appellee. When the documents had been executed and delivered, the parties separated and arranged to meet again the following Monday. As soon as appellee and his companion left, Raitman went to appellant's office in Chicago and offered to sell the interest of appellee and himself. Appellant's representative at the Chicago office called the Olney office, and appellant's land agent and division attorney arranged to be in Chicago Monday morning, September 22. Raitman left Chicago Saturday afternoon, going to Champaign, where he remained over night. The next day, Sunday, appellant's land agent and division attorney boarded the train at Effingham for Chicago, arriving there about nine o'clock that night. Raitman arrived in Chicago from Champaign on the train that reached Chicago about nine o'clock that night. A reasonable inference is that this was not entirely a coincidence, as all three parties necessarily rode from Champaign to Chicago on the same train. Raitman was a resident of

Olney at that time and was operating as an independent oil lease broker.

On Monday morning, September 22, appellant's land agent met Raitman in his room at the Palmer House. There Raitman agreed to sell the mineral deed for $3750 and he turned over all the documents appellee had executed on Saturday, September 20, including the "fifty-fifty" contract of employment, which were taken by the land agent to appellant's Chicago office for examination, the purchase having been agreed to subject to counsel's approval of the title. On that same morning appellee went again to Raitman's room and was told that a mistake had been made in the papers he had executed, and appellee executed additional documents. Arrangements were made for another conference in the afternoon at the same place. Raitman then went to appellant's Chicago office where he was informed that the division attorney had raised objections to the mineral deed lease, and divisional orders and appellant's representatives suggested that a new lease be executed by Lawrence Byrnes to appellant's nominee containing a retroactive effective-date clause, and that the delay-rental clause be stricken out.

A new lease was prepared by appellant's attorney and it was given to Raitman with other documents for him to have executed by appellee. Between three and four o'clock in the afternoon appellee met Raitman at the Palmer House and they went to Raitman's room where Raitman told appellee, according to appellee's testimony, that new papers would have to be made out because of a mistake in the originals concerning appellee's address, and Raitman then handed the papers to appellee, who put them in his coat pocket, and the two went downstairs. Appellee testified that when they reached the foot of the elevator they started to the notary's office, when Raitman said: "I have got a couple of friends supposed to meet me there. Here they come now;" that they reached the front of the notary's

office about the same time, when Raitman introduced appellee to the two men, Forrest and Hutcheson, and then went on into the office; that appellee waited near the door while Raitman was having the lady notary do some typing; that Raitman then asked appellee to sign the three or four papers, which appellee then did, without reading any of them or having them read to him. Certainly the fact that, just a short time before, Raitman had left appellant's office with papers prepared by appellant's counsel to be executed by Byrnes, and the further fact that Byrnes and Raitman were in the office of a notary public where such papers would likely be prepared, and where Raitman was working on papers, were, no doubt, strong circumstances considered by the court in determining that the documents being executed were those which had been prepared by appellant's counsel pertaining to the lease in question. The testimony further shows that both Forrest, appellant's land agent, and Hutcheson, its attorney, were at the door of the notary public's office at this time, where they could have easily made any disclosure to their employer's co-tenant, had they seen fit to do so.

We are not unmindful that the version of Forrest, appellant's land agent, as to just what happened at that time is at variance with the testimony of Byrnes. Forrest testified that he and Hutcheson were introduced to appellee after he and Raitman came out of the notary's office and at that time they said they had just completed signing the documents. Hutcheson testified that he first saw Raitman outside the door of the notary's office waving at him and telling him to wait a minute and he would be through; that Raitman came out and said he had signed as attorney in fact for his wife and was uncertain about the acknowledgment; that Raitman went back in and came out in a few minutes with appellee. Raitman testified that the lease in question and certain divisional documents were signed by appellee in Raitman's room in the hotel and that

they then went down to the notary's office, where the lease was acknowledged and the divisional orders were witnessed; that he, Raitman, then signed and acknowledged the lease and then signed the divisional orders; that he and appellee then met Forrest and Hutcheson as they walked toward the elevator; that he introduced appellee to the two men and the four went up to his room.

Taking all of this testimony into consideration, we do not see how it could reasonably be said that Forrest, the land agent, and Hutcheson, the attorney for appellant, did not know the nature of the papers being executed and did not have ample opportunity to make proper disclosure. Other testimony, not disputed, discloses that immediately they went to the room of Raitman, where Hutcheson examined appellee to make certain that he was the same Byrnes as shown by the records of Jasper county; that there in the room whiskey was served by Raitman; that they remained there about 45 minutes; that Hutcheson there said he was satisfied that appellee was the right man; that Forrest then gave to appellee a check for fifty dollars which Forrest there signed but which check had been prepared in appellant's Chicago office and given to Forrest. Appellee endorsed the check, Raitman cashed it at the hotel office and delivered the cash to appellee and then delivered the oil and gas lease with the divisional orders to Forrest. The evidence clearly proves that Forrest and Hutcheson knew they were dealing with appellant's cotenant; that the fifty-dollar check was given and the receipt taken as an acknowledgment that the transaction had been made with the right man. All these facts and circumstances, without any disclosure of the producing oil well on the premises and of the existence of the accumulated fund to appellee's credit from its operation, were, no doubt, considered by the court. The weight to be given this testimony was, under all the circumstances, a proper question for determination by the chancellor who saw and

heard the witnesses testify. In such cases the rule is that the finding of the chancellor will not be disturbed unless it is clearly contrary to the weight of the evidence, and we cannot say that the decree in this respect was not justified by the testimony. *Gouwens* v. *Gouwens*, 237 Ill. 506.

In the conference appellee discovered that his brother, C. C. Byrnes was living in Indianapolis. He went to Indianapolis, located his brother on September 24, and from him learned of the producing well and existing conditions. He informed his brother of what had transpired in Chicago and the two consulted counsel, who telephoned attorney Homer Kasserman, at Newton, to see if he would represent appellee in a suit against Raitman to set aside the mineral deed and the "fifty-fifty" contract. Kasserman agreed to represent appellee if appellant's interests were in no way to be affected, otherwise he, as local counsel for appellant, would not be in a position to take the case.

Kasserman testified that at a conference with appellee and his brother and appellee's Indianapolis attorney, on September 26, he was assured by appellee's brother that no attack was to be made on the validity of appellant's lease, and that accordingly, on September 27, he filed the suit against Raitman. He then notified appellant not to make any disbursements under the divisional orders, and verbally advised appellant's agent, on September 29, that there was to be no attack on appellant's lease. On the following day, September 30, appellant delivered its check for $3700 to Raitman's attorney, who cashed it.

On October 2, 1941, appellee's Indianapolis counsel conferred with appellant's representatives at their Olney office and then went to Kasserman's office in Newton. He told Kasserman that the lease to appellant did not look good and that it would, in all probability, be involved in the litigation. Kasserman thereupon withdrew from the case and other attorneys conducted the suit against Rait-

man to a successful conclusion, the decree setting aside the mineral deed and "fifty-fifty" contract being entered in August, 1942. During the pendency of that suit appellant's representatives attempted to have a divisional order signed by appellee, by which he would have ratified the lease to appellant containing the retroactive effective-date provision, which relieved appellant from paying to appellee the amount accumulated to his credit, $2241.79, under the decree of February, 1941. It is conceded that if the lease is held void appellee would be entitled as of September 30, 1942, to $8596.97, whereas under the lease he would be entitled to only $2230.82.

Appellee's counsel contended, and the chancellor so held, that appellant, as a cotenant of appellee, should not be permitted to take a conveyance of appellee's interest in the common property when appellant's representatives knew that oil was being produced and that a substantial sum was already on hand for appellee's benefit, without disclosing to the appellee the true conditions, if appellant's representatives had reason to believe that appellee was not in possession of such information. Appellant's counsel argues that a tenant in common does not occupy a fiduciary relation to his cotenant and owes no duty to make a disclosure when purchasing such cotenant's interest in the common property.

A fiduciary relationship did not arise merely from the fact that appellant and appellee were tenants in common. That they were tenants in common as to the oil must be conceded. The cotenancy arose by the acquisition by appellant of its lease of the three-fourths interest in the land. (*Zeigler* v. *Brenneman*, 237 Ill. 15.) Ordinarily, one tenant in common may deal with a cotenant respecting the common property. (*Albrecht* v. *Hunecke*, 196 Ill. 127.) But this court, in the case just cited, said: "The question whether there is a fiduciary relation between such parties, so that confidence is reposed by one in the other, will de-

pend upon all the facts and circumstances of the particular case."

Neither cotenant had the right to grant any right or license to do any act which would work a permanent injury to the inheritance. (*Zeigler* v. *Brenneman,* 237 Ill. 15; *Murray* v. *Haverty,* 70 Ill. 318.) Prior to the act of 1939, (Ill. Rev. Stat. 1943, chap. 104, pars. 25-33 incl.,) any cotenant assuming to exercise exclusive ownership became liable to account for damage to the inheritance, (*Murray* v. *Haverty,* 70 Ill. 318,) and was not allowed to deduct expenses incurred in taking the profits from the land. But a cotenant in possession has been held entitled to credit for money expended for taxes and labor in protecting and preserving the common property and in marketing the proceeds from the land. *Cheney* v. *Ricks,* 187 Ill. 171.

The stern rule of liability of a cotenant, who commits waste or damage to the common property, has been relaxed where the profit taken from the land is of a fugacious nature and liable to be exhausted by adjacent operators. In such cases, the rule allowing deductions for money spent in protecting, preserving and marketing applies, and where the subject matter is oil, the cotenant who takes it from the land must account to his cotenants for their respective proportions of the net value of the oil produced, which is its market value, less the cost of extracting and marketing it. (*New Domain Oil & Gas Co.* v. *McKinney,* 188 Ky. 183, 221 S. W. 245; *Prairie Oil & Gas Co.* v. *Allen,* (Okla. D.C.A.) 2 Fed. 2d 566; *Burnham* v. *Hardy Oil Co.* (Tex. Civ. App.) 147 S. W. 330, affirmed 108 Tex. 555, 195 S. W. 1139.) That was exactly the accounting rule provided by the statute of 1939, aforesaid, whereby court permission was granted to the holder of a majority of joint interests to drill, produce and market oil from the common property to protect it from being drained by adjacent wells.

Appellant asserts that the decree of February 27, 1941, granting appellant permission to enter, produce and market oil from the farm in question created the relation of debtor and creditor. With that contention we cannot agree. A trust differs from a debt in many respects. The beneficiary of a trust has the beneficial interest in the property, whereas a creditor has only a personal claim against the debtor. There is no fiduciary relation between debtor and creditor, whereas the trust relation is of a fiduciary nature. Trusts are enforced in equity while creditors must sue at law. (*Kilgore* v. *State Bank of Colusa,* 372 Ill. 578.) Both by statute and the decree of February 27, 1941, appellant was subjected to the equitable action of accounting, and it was subjected to the obligation of reporting and turning over to the court, for the use and benefit of appellee, his proportion of the net profits from the oil. A constructive trust arose, not by virtue of the decree nor by virtue of the statute, but by virtue of appellant having the right to take possession and control of the common property for its protection against loss from being drained by adjacent wells. The court, by its decree, merely acquired jurisdiction to administer the trust created by the acts of appellant. Good faith is the very essence of the trust relation so created and required full disclosure of the value represented by the interest in the land and the accumulation. Having knowledge that Raitman had a "fifty-fifty" contract to represent appellee as his attorney, it was incumbent on appellant to show that it observed the utmost good faith in dealing with the trust property. (*Abbott* v. *Church,* 288 Ill. 91.) Appellant cannot successfully contend that it was a *bona fide* purchaser for value of appellee's interest. By receiving the fruits of Raitman's fraud, appellant is as much tainted as if it had participated therein. *Callner* v. *Greenberg,* 376 Ill. 212; *Garlick* v. *Imgruet,* 340 Ill. 136; *Wierich* v. *De Zoya,* 2 Gilm. 385.

Appellant's duty to disclose to appellee the existence of the producing well and of the fund then in its possession for the use and benefit of appellee was clear, as shown by the evidence. The chancellor's finding in this respect was not contrary to the manifest weight of the evidence.

We agree with appellant's general assertion that the law in Illinois requires that anyone seeking to rescind a transaction on the ground of fraud must elect to do so promptly after learning of the fraud and must announce his purpose and adhere to it. (*Kanter* v. *Ksander,* 344 Ill. 408; *Huiller* v. *Ryan,* 306 Ill. 88; *Greenwood* v. *Fenn,* 136 Ill. 146; *Hansen* v. *Gavin,* 280 Ill. 354.) But where a fiduciary is under a duty to make full disclosure, concealment is a factor that weighs heavily against a claim of *laches* and estoppel. (*Russell* v. *Republic Production Co.* 112 Fed. 2d 663.) The chancellor did not err in cancelling the lease in question and in ordering an accounting under the terms of the decree of February 27, 1941.

Appellee, in support of his assignment of cross errors, contends that the chancellor erred in finding and decreeing that appellant, in making its accounting, should deduct and take credit for $3700, being the amount paid to S. B. Raitman. We do not find that appellant, in its cross petition in the trial court, prayed for such relief, and, ordinarily, relief of this character will not be granted unless a cross complaint, praying for such relief, has been filed. However, where the plaintiff is bound to do equity as a condition to obtaining relief, the foregoing rule is subject to an exception. In such a case the court has the power to protect the equitable rights of both parties and, if it sees fit, to give affirmative relief to the defendant by enforcing an equitable claim. (19 Am. Jur. 283, par. 412.) A court of chancery may, in its discretion, impose equitable terms on which relief will be granted, (*Galbraith* v. *Tracy,* 153 Ill. 54,) even though there be no demand therefor. (30 C. J. S. 994.) The evidence offered in connection

with the payment of this sum by appellant was conflicting. But from a careful consideration of the entire record we are not prepared to say that the chancellor abused his discretion in holding that appellant would not have paid out the $3700 to Raitman had it not been for the assurance that there would be no attack on the validity of the lease.

For the above and foregoing reasons, the decree of the circuit court is affirmed.

*Decree affirmed.*