No. 16,591.

WESTERN AIR LINES, INC. v. HOLLENBECK.
(235 P. [2d] 792)

Decided August 6, 1951.

Messrs. LEWIS, GRANT, NEWTON, DAVIS & HENRY, Mr. RICHARD M. DAVIS, Mr. BYRON R. WHITE, for plaintiff in error.

Mr. JOHN R. COEN, Mr. DONALD C. MCKINLAY, for defendant in error.

*In Department.*

MR. JUSTICE MOORE delivered the opinion of the court.

THIS is an action upon a contract of employment. The plaintiff-employee Hollenbeck, an airplane pilot, sued the defendant-employer, Western Air Lines, for retroactive pay alleged to be due him for flying four-engine airplanes under the terms of said contract of employment.

Hollenbeck had worked as a pilot for Western Air Lines since 1929. Upon the outbreak of World War II he went on active duty with the navy and upon his release from service he returned to his employment with the defendant company. He was a member of the Airline Pilots Association, hereinafter referred to as the union. The union and the company, in 1940, had entered into a contract covering the usual terms of employment between the company and its pilots, but this contract did not cover services on four-engine airplanes since such planes were not then in use by the company. In the fall of 1945 the union and the company began negotiations in an effort to reach an agreement as to the rate of additional compensation to be paid pilots for flying four-engine planes. These planes were placed in use in January, 1946. The pilots, through their local union officials, indicated to the company that although they had bid on four-engine runs they did not propose to fly the larger and heavier planes until agreement had been reached concerning the rate of pay that they would receive and the working conditions governing their employment as such pilots.

About December 21, 1945, a number of airline companies, including Western Air Lines, named a committee of six members known as the Airlines Negotiating Committee. This committee was authorized to negotiate with the union concerning rates of pay for flying four-engine aircraft. It handled all negotiations between the union and Western Air Lines from December 28, 1945, until

September 20, 1946. At the beginning of the negotiations the committee addressed a communication to the union requesting it to recommend to the pilots that they fly the four-engine planes at the pay rates fixed in existing agreements, pending final determination of the rate of pay to apply to such service. The letter stated, inter alia: "With such assurance from you we hereby guarantee, on behalf of the airlines which we represent, that any settlement of the question of pay for pilots of four-engine aircraft will be retroactive to the date such aircraft were placed in scheduled operation."

On January 22, 1946, the company posted a bulletin addressed, "To All Pilots," which included, inter alia, the following:

"In answer to questions which have arisen regarding pay scale for four-engine equipment, you are advised that the Company intends to pay in accordance with provisions of our existing agreement between Western Air Lines-Inland Air Lines and the Air Line Pilots Association, International.

"In the event that an adjustment is made in the pay for flying four-engine equipment such adjustment will be applied retroactive to the beginning of four-engine equipment operation."

The pilots, including Hollenbeck, who flew four-engine planes, approved the contents of this bulletin by placing their signatures or initials on the posted notice.

The union refused to recognize the Airlines Negotiating Committee as the proper bargaining agency because it treated the situation on a nationwide basis and was acting on behalf of thirteen companies. The position of the union was that collective bargaining should be done through authorized representatives of each company, and that the bargaining should be separate and distinct in each case.

After several weeks of inaction the committee invoked the procedures prescribed by the Railway Labor Act, whereby the disputes between the committee, on behalf

of thirteen airlines, and the union were put through mediation, and the President appointed an Emergency ("fact finding") Board to investigate the same. Before this Board, the position of the union was that said Board had no jurisdiction in any case other than that of TWA, and the union declined to participate in any hearing concerning the twelve other cases, including that of Western Air Lines. The Emergency Board heard the TWA case and made specific findings and recommendations therein, and the remaining twelve cases were called up but the union remained aloof.

So far as here pertinent, the outcome of this proceeding, as reported by the Presidential Emergency Board, was that they found that the union had wrongly refused to bargain with the Airlines Negotiating Committee, since each airline had the legal right to designate the committee as its authorized bargaining representative, and the Emergency Board recommended that the dispute between Western Air Lines and the union be referred back to the Airlines Negotiating Committee and the union for negotiation, looking toward a settlement of matters in dispute between the company and the union on the basis of the specific recommendations made by the Board in the case of TWA. This ended the functions of the Presidential Emergency Board.

On July 7, 1946, the report of the Presidential Emergency Board was handed down. On August 5, 1946, the Airlines Negotiating Committee sent a telegram to the union inviting them to negotiate with the committee pursuant to the recommendation of the said Board. No reply to this telegram was made by the union.

On September 20, 1946, the Airlines Negotiating Committee sent another telegram to the union in which mention was made of the failure of the union to respond to the invitation to negotiate, and which stated that certain airline companies, including Western Air Lines, " * * * will place in effect immediately the rates of pay and working rules on four-engine aircraft recommended by

the Presidential Emergency Board. * * * In accordance with the pledge of the lines listed above and this conference the new rates and such changes therein as result from the Board's interpretations will be applied retroactively to the beginning of operation of commercial four-engine aircraft." On the same date Western Air Lines posted on its bulletin board, at appropriate points, a notice to all its pilots stating that it was placing into effect immediately the increased rates of pay and working rules recommended by the Presidential Emergency Board. This notice concluded with the statement: "In accordance with the pledge of Western Air Lines, Inc., and of its duly authorized agent for collective bargaining purposes [the Airlines Negotiating Committee], the rates being placed in effect will apply retroactively to the beginning of the operation of commercial 4-engine aircraft." Hollenbeck read this bulletin and understood its contents.

On September 19, 1946, the president of the union wrote Western Air Lines stating that the pilots had rejected the recommendations of the Presidential Emergency Board, as had the union, and requested a renewal of negotiations. This letter was actually received by the company subsequent to September 20th, the date upon which the company elected to place in effect the recommendations of the Presidential Emergency Board.

On October 12, 1946, the union addressed a formal request to Western Air Lines for numerous changes in the labor agreement under which the pilots were employed. Negotiations were thereafter carried on by the company and the union, without the intervention of the Airlines Negotiating Committee. These negotiations resulted in a new contract between the union and the company, dated December 19, 1947. Retroactive pay increases for pilots flying four-engine aircraft were provided for in this contract. Hollenbeck flew four-engine airplanes for the company from January 22, 1946, to March 1, 1947. It was stipulated at the trial that the amount of retro-

active pay to which he would be entitled for flying four-engine airplanes if said contract applied to him, was the sum of $2,661.34. He testified that prior to acceptance of this employment he had been given oral assurance by officers of the company that he would receive more pay on the four-engine machines than he had received on the two-engine planes that he flew before the war, and that he relied on this representation, and the promise of retroactive pay, in accepting employment. As hereinabove pointed out, Hollenbeck was not employed by the company at the time the contract of December 19, 1947, was made. Following the election of the company to place in effect the rates of pay as stated in their telegram of September 20, 1946, and as contained in the posted notice of the same date, the compensation actually paid the pilots, including Hollenbeck, was based upon the schedule thus fixed.

On November 12, 1946, the company paid Hollenbeck the sum of $131.59, by check, on the stub of which was stamped "DC 4 Retro." Hollenbeck wrote the word "Retroactive" across this check stub, which was attached to the check when delivered to him. The purpose of the stub was to provide the payee with a record of his earnings. Nothing appeared on the face of the check indicating what it was given for. Hollenbeck did not cash it at once but asked union officials about it. The president of the union, on November 27, 1946, wrote the company as follows:

"We have received word that you have issued certain back pay to your pilots based on the defunct Emergency Board's recommendations, which recommendations have been rejected by your pilots.

"They cannot, of course, prevent you from taking this action, but they have requested me to inform you that any back pay checks you issue to them in accordance with any recommendations relating to rates of compensation that are not acceptable to them can be accepted

only on account as further adjustments will obviously be made on any such rates of compensation.

"If this is not entirely clear to you, I shall appreciate having you write me about it."

The company made no reply to this letter and Hollenbeck cashed the check in the latter part of December, 1946. He contends that he accepted the check as payment on account of money due him for flying the four-engine planes, and that said check was not accepted as payment in full for his claim for retroactive compensation. About the same time all other pilots received retroactive pay under similar circumstances.

Trial was to the court without a jury and resulted in judgment in favor of Hollenbeck for $2,661.34, plus interest and costs. The company seeks reversal by writ of error.

Questions to be Determined.

First: *Did the company fully perform the promise to make retroactive, to the beginning of four-engine operation, any adjustment in pay for flying such planes, when by unilateral action it placed in effect the rates of pay recommended by the Presidential Emergency Board?*

The answer is "No." The substance of the contract governing Hollenbeck's employment was that he would fly four-engine planes for the company and be paid according to the rates contained in the 1940 agreement, but that in the event an adjustment in the rate of pay for piloting said planes was agreed upon he would receive the full benefit of such adjustment retroactively for all such flights made by him. The trial court found that this adjustment was made and the rate of compensation for operating the heavier aircraft was fixed when the company and the union, on December 19, 1947, entered into an agreement which specifically set forth rates of pay for that type of employment. At no time prior to this agreement could the matter of compensation for flying four-engine planes be said to be finally determined. Hollenbeck's contract of employment did not contem-

plate an "adjustment" of compensation by the fiat of the company or by unilateral action. The union was the authorized collective bargaining agent of the pilots. The record discloses that the union, on behalf of the pilots, had negotiated the contract of 1940. It also had rejected the schedule of pay increases placed in effect by the company on September 20, 1946.

Under the circumstances existing on January 22, 1946, it is clear that the "adjustment," which it was then contemplated would be made at a future time concerning compensation for flying four-engine planes, would be one agreed upon by the union and the company. It is significant to note that in the final contract between the company and the union it was provided that the effective date thereof should be December 19, 1947, except: "Retroactive pay shall be paid to first pilots and copilots for flying DC-4 aircraft as of the start of scheduled DC-4 operations by the Company."

The company agreed in January, 1946, to pay the extra four-engine pay retroactively when an adjustment was made. The adjustment contemplated was one to be negotiated by mutual consent. The first such adjustment made was the contract of December 19, 1947, which made specific reference to the very heart of the controversy and fully disposed thereof in terms that fixed the liability of the company for retroactive pay to pilots.

Second: *Was the contract under which Hollenbeck accepted employment in January, 1946, revoked by the substitution of a new contract on September 20, 1946?*

The answer is "No." A meeting of the minds of contracting parties is required not only to make a contract, but also to abrogate or modify it after it is made. *Vincent v. Palmer,* 179 Md. 365, 19 A. (2d) 183.

In *Adams v. Guiraud,* 69 Colo. 112, 169 Pac. 580, we stated: "Nothing is better settled than that one party to an executory contract, in the absence of fraud or a special reason, cannot rescind. To rescind by agreement,

the agreement must be mutual, and by all the necessary parties to the original contract. Such rescission must be with the clear knowledge and understanding of the parties. The same degree of proof of rescission will be required as in case of proof of the contract alleged to have been rescinded. The burden to prove an agreement to rescind, is upon the party alleging it."

Counsel for Western Air Lines argue that the posting of the bulletin of September 20, 1946, and the subsequent voluntary payment of a slightly higher pay to pilots for flying the heavier planes, and all the circumstances connected therewith, amounted to the abrogation of the former contract and the substitution therefor of the terms and conditions referred to in the bulletin posted by the company. The latter instrument was not necessarily inconsistent with the contract of January, 1946. It carefully avoided any specific reference to the previous promises made by the company to pay retroactively any "adjustment" in pay. It did not notify the pilots that any acceptance of the new schedule of compensation would amount to a new contract in substitution of the first agreement. In itself it was not a contract at all but was a unilateral pronouncement by the company, and the latter was immediately informed by the union that the conditions thereof were not satisfactory. Since it was not necessarily inconsistent with the agreement of January, 1946, there is no reason to believe the September 20th bulletin was intended and understood to revoke and supersede the first one. The trial court, in finding that there was no substitution for the first agreement relating to retroactive pay, said: " * * * the evidence is unconvincing that the plaintiff was bound by the actions of the company." We agree with this statement.

Third: *Was there an accord and satisfaction of the matter in dispute because of the fact that Hollenbeck endorsed and cashed the check for $131.59 which the company paid him and which was credited to retroactive pay for piloting four-engine airplanes?*

This question is answered in the negative. The company contends that by the acceptance of the check for $131.59 there was an accord and satisfaction of all claims of Hollenbeck for an additional retroactive pay adjustment. To substantiate this argument the company relies on three exhibits, the first of which is separated in point of time from the other two by approximately three weeks. This exhibit is the bulletin of September 20, 1946, in which the company elected to place in effect rates of pay and working conditions for flying the heavy planes which had been recommended by the Presidential Emergency Board in disposing of the case of TWA. Among other things this bulletin stated:

"In accordance with the pledge of Western Air Lines, Inc. and of its duly authorized agent for collective bargaining purposes, the rates being placed in effect will apply retroactively to the beginning of the operation of commercial 4 engine aircraft.

\*   \*   \*

"Should any interpretation of the Presidential Emergency Board further increase the amount of pay checks issued as a result of this notice, checks covering the additional amount will be distributed as promptly as practicable."

The other two exhibits relied on are the cancelled check, bearing the endorsement of Hollenbeck, and the stub which was attached to it at the time it was received. They were dated November 12, 1946. It is patent from the documents themselves that the check tendered was not accompanied by any statement that it was sent in full satisfaction of Hollenbeck's claim. Nothing whatever appears on the check indicating the obligation for the discharge of which it was paid. No condition appears on the check stub. The word "Retro" was stamped upon it but this was wholly insufficient to create a condition. No letter or enclosure was received by Hollenbeck with the check. At the time he received it no statement of any kind was made to him indicating that acceptance of same

was conditioned upon a full release of his claim. The trial court found that there had been no accord and satisfaction.

Essential elements necessary to give rise to an accord and satisfaction were stated by us in *Pitts v. National Independent Fisheries Co.*, 71 Colo. 316, 206 Pac. 571, as follows:

"In order to constitute an accord and satisfaction, it is necessary that the money should be offered in full satisfaction of the demand, and be accompanied by such acts and declarations as amount to a condition that the money, if accepted, is accepted in satisfaction; and it must be such that the party to whom it is offered is bound to understand therefrom that if he takes it, he takes it subject to such conditions. 1 C.J. 557; *Rio Grande County v. Hobkirk*, 13 Colo. App. 180, 56 Pac. 993."

It is obvious that these essentials are not present in the case at bar. The burden of proof in establishing the defense of accord and satisfaction rested upon the company. In order to justify reversal on the grounds of accord and satisfaction it would be necessary for us to determine, in substance, that the three exhibits above mentioned had the legal effect of saying to Hollenbeck that if he cashed this check he would be accepting its proceeds in full payment and satisfaction of his rights and claims under the January, 1946, contract. The said exhibits do not justify any such conclusion as a matter of law.

Careful examination of the record in connection with the specification of points, upon which the company relies, discloses no reversible error, and the judgment accordingly is affirmed.

MR. CHIEF JUSTICE JACKSON and MR. JUSTICE STONE concur.