**RIO ALGOM CORPORATION,
Plaintiff and Appellant,**

v.

**JIMCO LTD., Humeca Exploration Company, Jim L. Hudson, Juanita J. Meyer as Executrix of the Estate of Daniel H. Meyer, Eldon J. Card, Norma Hudson, Jean L. Card, Juanita J. Meyer, N. J. White, Audrey White, Wilma White, Otis Dibler, Dorothy Mae Dibler, Grace Davis, and Marlowe C. Smith, Defendants and Respondents.**

**No. 16032.**

Supreme Court of Utah.

Sept. 19, 1980.

---

James B. Lee and Kent W. Winterholler of Parsons, Behle & Latimer, Salt Lake City, for plaintiff and appellant.

Albert J. Colton and Anthony L. Rampton of Fabian & Clendenin, Clifford Ashton of VanCott, Bagley, Cornwall & McCarthy, and Clifford D. Vernon, Salt Lake City, William G. Waldeck, Grand Junction, Colo., for defendants and respondents.

STEWART, Justice:

The plaintiff, Rio Algom Corporation ("Rio"),[1] brought this action seeking a declaratory ruling as to the proper basis for computing and disbursing royalties payable by Rio as a lessee under lease agreements covering uranium producing properties in San Juan County, Utah. There are two groups of defendants: the Jimcos[2] and Audreys.[3] The Jimcos counterclaimed against

---

1. Rio Algom Corporation is a foreign corporation qualified to do business in the State of Utah. It is a subsidiary of Atlas Alloys, Inc., which in turn is a subsidiary of Rio Algom, Ltd., of Canada.

2. The first group of defendants (the "Jimcos") takes its name from Jimco, Ltd., a limited partnership, which has more than 100 limited partners. Humeca Exploration Company is a partnership whose partners, Jim L. Hudson, Juanita

J. Meyer, and Eldon J. Card, are the general partners of Jimco, Ltd. Norma Hudson, Jean L. Card, and Juanita Meyer are also members of the Jimco defendant group.

3. The Audrey defendants are individuals who participated in the original discovery of the uranium properties (or the widows of such persons) and who are owners of undivided interests in the mineral claims. This group includes N. J. White, Audrey White, Wilma White, Otis

Rio and also cross–claimed against the Audreys. The Audreys cross–claimed against the Jimcos and counterclaimed against Rio, alleging breach of contract and seeking payment of royalties above the amount which Rio claimed to be due.

This appeal is taken by Rio from a district court order dated August 29, 1978, which ruled that a settlement agreement dated July 10, 1978, between the Audreys and the Jimcos was enforceable as to the royalty rate to be paid by Rio and that the agreement did not violate any contract duty owed to Rio by any of the defendants. The court dismissed with prejudice all additional claims by Rio against the Audrey defendants, the claims by the Audrey defendants against Rio and the Jimcos, and the claims by the Jimcos against the Audrey defendants. The court ordered Rio to pay to the Audreys that portion of the royalties to which the Audreys were entitled under the Audrey lease and the settlement stipulation.

In 1964 the Audreys leased uranium properties to the predecessors in interest of the Jimcos. This lease was later superseded by a new agreement between the Audreys and the Jimcos (the "Amended Audrey Lease," or "headlease") executed July 12, 1968, and back–dated to June 1, 1968. Prior to the execution of the amended Audrey lease, Rio acquired a ¼ undivided interest in the subject properties. In addition, in an agreement dated June 3, 1968, the Jimcos granted to Rio an option to acquire Jimcos' rights and obligations as a lessee under the amended Audrey lease. Rio exercised the option June 18, 1968. In so doing Rio became not only the *lessee* of all the properties subject to the Audrey lease, but also one of the *lessors* under the headlease with a ¼ undivided royalty interest. As consideration for Jimcos' assignment to Rio, Rio agreed to pay royalties to the Jimcos, in addition to the royalties payable under the amended Audrey lease to the Audreys.

The following diagram illustrates the various relationships among the parties:

Dibler, Dorothy Mae Dibler, Grace Davis, and Marlowe Smith (who died after the commence-

Pursuant to the assignment of the leasehold interest from the Jimcos, Rio commenced the mining of uranium ore from the subject properties. Rio contracted to sell to Duke Power Company the beneficiated product $U_3O_8$, also referred to as uranium concentrate or "yellowcake."

The present dispute evolved from a potential conflict between the Audrey–Jimco headlease provisions for alternative methods for computing royalties under that lease and the royalty provisions in the Jimco–Rio lease. Basically, two alternative royalty formulas for determining the royalty to be paid by the Jimcos (or its assignee) were provided under the headlease. The first formula was based on the sales price or gross value of the product sold or used by Rio: 8% of the sales price if crude ore were sold, or 4% of the gross value of yellowcake if yellowcake were sold. The second formula was based on fair market value of crude ore.

The royalty provisions of the Amended Audrey lease are found in Paragraphs 3.1 and 3.2. Paragraph 3.1 provides:

(a) In the event Lessee shall mine or extract ore from the Audrey Group which is sold in its raw or crude form Lessee shall pay Lessors a royalty equal to *eight per cent (8%) of the 'Sales Price'* (as hereinafter defined) received by Lessee from the sale of all ores mined, produced and sold in the crude form from the Audrey Group . . .

(b) In the event Lessee shall mine or extract ore from the Audrey Group and

ment of this action and is survived by his wife, Adrian).

recover therefrom for sale or use in commercial quantities any of the minerals contained in such ore, and if the minerals so recovered shall be any uranium compound, *Lessee shall pay to Lessors a royalty of four per cent (4%) of the* 'Gross Value' of such compounds (as hereinafter defined). . . .

Paragraph 3.2 of the Audrey agreement provides the alternative basis for the computation of royalties. That provision allows the lessors to elect to have royalties computed on the basis of the *fair market value of crude ore,* regardless of whether uranium concentrate or crude ore was sold by Rio. That provision states:

> Irrespective of the provisions set forth in paragraph 3.1 above, Lessors shall have the election and option to have royalties due them under the terms of this Lease calculated and paid upon the basis of eight percent (8%) of the fair market value at the mine portal of crude ore mined and produced from the Audrey Group. . . .

Paragraph 3.2, which is critical in this dispute, also provides for an election by the lessors under the Audrey lease as to which royalty formula would be binding. That paragraph states:

> . . . [I]n order to exercise such election Lessors must unanimously agree and notify Lessee in writing at least ninety (90) days prior to the commencement of any calendar year of their election to require royalties to be calculated and paid in such manner. After having given such notice, the election so made shall remain in force and effect for the next ensuing calendar year, and from year to year thereafter, unless the Lessors should unanimously agree to notify Lessee in writing of their revocation of said election, which notification must be given at least ninety (90) days prior to the commencement of a calendar year and shall become effective at the commencement of, and remain in effect during the ensuing calendar year, and from year to year thereafter, unless another such notification of election is given at the time and in the manner as specified above.

However, because of the assignment by the Jimcos to Rio, Rio was placed in a conflict of interest situation with the other lessors under the Audrey headlease as a result of its contractual right to receive one–fourth of the royalties earned under the Audrey lease and, at the same time, as a lessee with the obligation to pay the full amount of the royalties. Under these provisions, Rio's interest was to pay the smallest amount of royalties possible. To deal with that conflict of interest, Paragraph 21.3 of the amended Audrey lease excluded Rio from voting in an election for selection of a royalty formula under the headlease. Paragraph 21.3 states:

> *Rio Algom Corporation shall, by reason of its interest in this Lease as described in Section II hereof, be excluded from any vote or decision of the Lessors relating to royalties and requiring unanimity of the Lessors, as provided for in Section 3.2 hereof.* The unanimous vote or decision of the remaining Lessors other than Rio Algom Corporation shall constitute unanimity for the purpose of the said Section 3.2. [Emphasis added.]

The Jimco assignment establishes royalties to be paid by Rio to the Jimcos and sets payment priorities as between the Audreys and the Jimcos. The Jimco assignment provides in Paragraph X that if uranium concentrate is sold, Rio, as assignee of that lease, is to pay "earned royalties" to royalty interest holders (i.e., the Audreys and Rio under the Audrey lease, and the Jimcos under the Jimco agreement) according to a schedule that provides for payments of between 8% and 15% of the average price per pound of $U_3O_8$. Once the dollar amount thereof has been calculated, Rio is to make payments according to the following priorities:

> (i) first, to satisfy the royalty to the Lessors in the Head Lease [Audrey Lease] . . . in its entirety . . .

> (ii) second, if a balance of Earned Royalty . . . remains after payment of Lessors' royalties . . . to pay in their entirety the Overriding Royalties . . .

(iii) third, *if a balance of Earned Royalty ... remains* after payment of the Lessors' royalties and Overriding Royalties ... to pay such balance to JIMCO. (Emphasis added).

The Jimco agreement also establishes a ceiling based on the sales price of $U_3O_8$ which operates to limit Rio's total obligations under the Audrey and Jimco agreements and gives payment priority to the obligation under the Audrey lease in case the ceiling is met. If the royalties paid under the Audrey lease were based on the value of yellowcake, the Jimcos would be assured of receiving some royalties; but if the royalties were based on a percentage of the ore value and that amount equaled or exceeded 15% of the yellowcake value, no royalties would be owed the Jimcos because of the ceiling provision in the Jimco agreement. As long as the Audreys elected royalty payments based on yellowcake price, the Jimcos would be assured of receiving royalties. However, if the Audreys elected a royalty based on the value of crude ore and the market value of ore increased substantially, the Jimcos could be entitled to little or no royalties.

In August 1975, the Audrey defendants elected to change the royalty payment basis in 1976 from the 4% of the yellowcake value to 8% of the ore value as permitted by the headlease. The Audreys asserted that the basis for calculating the royalty should be the external fair market value of crude ore, unrelated to Rio's production and sale of yellowcake, but the Jimcos claimed that the royalty basis should be determined by reference to Rio's actual selling price for yellowcake or other uranium products produced from the subject properties. Royalties based on a higher external market value would result in higher payments under the Audrey lease and reduce the royalties paid to the Jimcos. The Audreys' election of the ore value royalty basis thus triggered the present dispute. If the Audreys' assertion that the royalties should be based on external market value were found to be correct, the Audreys stood to receive a substantial benefit at the Jimcos' expense.

Rio instituted the present action to resolve the question of its royalty obligations to the two claimant groups. In its complaint Rio alleged it stood willing and able to make royalty payments to the Audreys as per the election of the Audreys under the headlease and to the Jimcos under the assignment of the Jimco lease. Rio paid into court amounts representing royalty payments owed to the defendants and asked that the court adjudge the correct basis for apportioning the payments between the Audreys and the Jimcos.

In July 1978, more than two years after the commencement of this action and shortly before the matter was scheduled to go to trial, the Audreys and the Jimcos entered into a "settlement agreement" contingent upon court approval. Without determining whether "fair market value" of the ore meant sales price or external market value, the defendants agreed as to how the royalties to which they were entitled would be distributed as between themselves. The Audreys in the settlement agreement permanently waived their right to elect under Paragraph 3.2 of the amended Audrey lease to have Rio pay royalties based on 8% of the market value of crude ore. This waiver foreclosed the possibility of an election of higher royalties to the Audreys and Rio under the headlease in the event that a royalty based on ore value (calculated with reference to external market value) exceeded a royalty based on the yellowcake price.

The Audreys agreed to make a permanent election of a royalty under the headlease based on 4% of yellowcake sales. Thus the Audreys were entitled to 3% of the sales price of $U_3O_8$ (after reduction of Rio's one–quarter interest) under the Audrey lease. The Jimcos, in consideration for the Audreys' waiver of the alternate royalty provision under the headlease, assigned to the Audreys an additional 2.5% of the yellowcake sales price due the Jimcos under the Jimco assignment to Rio. This division of royalties was to apply retroactively to those funds on deposit with the court as well as prospectively for the remainder of the Audrey lease period. Also, as part of

the agreement, both parties dismissed all their claims against each other.

Rio objected to the settlement stipulation because Rio was precluded by that agreement from the possibility of receiving, as a co–lessor under the Audrey lease, larger royalty payments in the form of (1) royalties tied to the external market value of crude ore, because the Audreys had contractually waived that possible alternative, and (2) a share of the 2.5% of royalties received by the Audreys as consideration for their waiver.

In view of Rio's objections to the settlement stipulation, the agreement was expressly made subject to a court ruling that Rio was legally precluded from challenging its implementation and that the stipulation did not violate any duty owed to Rio by any of the defendants. A motion was filed seeking the requisite court ruling. Rio filed objections to the proposed settlement stipulation and also filed an amended complaint wherein it asserted that the stipulation constituted, among other things, tortious interference with its contract rights, a breach of fiduciary duties owed to it, and a violation of its contract rights. The trial court ruled in favor of the defendants and approved the terms of their agreement. Rio's amended complaint was dismissed for failure to state a cause of action.

On appeal Rio contends that the Audreys' waiver of election rights violated Rio's rights under the amended Audrey lease. Specifically, the issue is whether the Audrey defendants have the right to enter into an agreement permanently revoking, for consideration, the election rights provided in Paragraph 3.2 of the amended Audrey lease without violating Rio's contractual rights. Rio's position is that the settlement stipulation effects material changes in its contractual agreements with the Audreys under the Audrey lease and with the Jimcos under the Jimco agreement.

Rio acknowledges that the amended Audrey lease expressly excluded Rio from participation in the royalty election decision, but Rio asserts that the Audreys were barred from making an election that was not beneficial to Rio because of an implied covenant of good faith and an asserted fiduciary duty that one cotenant owes another cotenant. Rio argues that it is harmed by receiving a smaller proportion of the total royalties to be received by the Audrey lessors as a result of the settlement agreement[4] and that this fact constitutes a modification of the Audrey and Jimco leases without its concurrence.[5] Also, the Audreys, by abandoning the position that their royalties under the headlease should be based on external fair market value of ore, have permanently precluded Rio from the possibility of sharing in the consequences of that potentially more lucrative formula.[6]

Rio relies on the general proposition that the terms of a contract cannot be modified without the consent of all the parties. *Malstrom v. Consolidated Theaters*, 4 Utah 2d 181, 290 P.2d 689 (1955), *Western Airlines v. Hollenbeck*, 124 Colo. 130, 235 P.2d 792 (1951). The Audreys and the Jimcos, on the other hand, deny that their agreement constitutes a modification of the leases in question.

■ To determine whether the Audrey defendants effected a modification of the

---

4. Rio is entitled to 25% of the royalties paid pursuant to the Audrey lease ($\frac{1}{4}$ of the 4% of yellowcake sales royalty). However, its percentage is only 15.3% of the Audreys' and Rio's total royalties, including the additional 2.5% to be paid only to the Audreys by the Jimcos under the settlement agreement.

5. The claim of modification of the Rio- Jimco lease is based on that lease's embodiment of the terms of the amended Audrey lease as they apply to Jimco's tenancy rights and obligations which were assigned to Rio. It is therefore unnecessary to deal separately with the effect of the stipulation on the Jimco lease.

6. Since Rio's contract with Duke Power provided for a yellowcake sales price which the parties contend was below that of the prevailing market price at the time this dispute arose, a royalty based on external fair market value would increase cotenant Rio's royalty share as lessor/payee and not result in a greater obligation as lessee/payor because of the limit on maximum royalties payable in the Jimco contract.

Audrey lease and violated a duty owed to Rio, we look to the language of the amended Audrey lease as it pertains to royalty rights. The election option provided in Paragraph 3.2 is set out in pertinent part above. The Audreys' right to waive that election without Rio's concurrence is clearly authorized by Paragraph 21.3 of the Audrey lease. That provision states that Rio "shall . . . be excluded from any vote or decision of the lessors relating to royalties." Because of the inherent conflict of interest created by Rio's position as both payor and payee of royalties, the exclusive right to exercise the option was conferred on the Audreys. Rio had no contractual right with respect to the election process. Accordingly, we view the Audrey–Jimco agreement simply as a waiver of a right possessed by the Audreys. That waiver did not constitute a modification of the headlease or a violation of. any rights that Rio had thereunder.

■ By the Audreys' waiving the option election and agreeing to accept the yellowcake sales basis for the royalties. payable under the Audrey lease, a new royalty has not been created.[7] One of the choices available to the Audreys–clearly permissible under the terms of the Audrey lease–has been selected on a permanent basis. Under the express terms of Paragraph 3.2 an election once made is effective for each year thereafter unless and until expressly revoked by the Audrey defendants. A permanent election is no different in effect than an election made pursuant to the lease agreement without a subsequent revocation. Rio had no legal right to challenge either such an election or a refusal to revoke an election.

■ Nor has Rio any right to challenge the Audrey–Jimco agreement. The Audreys' agreement with the Jimcos is a contract separate and apart from the Audrey lease. The Jimcos assigned a benefit they had under the Rio–Jimco agreement in return for the relinquishment of a contract right by the Audreys. Even though that agreement affects the option election of the Audrey lease, Rio, by virtue of having agreed to the exclusion from the decision as to how royalties should be determined, has no standing to challenge the Audrey–Jimco agreement. The Audreys had every right to exercise that option as they pleased. As stated in 3 *Corbin on Contracts* § 564 at 293 (1960), "[W]here the parties have made an express contract, the court should not find a different one by 'implication' concerning the same subject matter if the evidence does not justify [such] an interference . . . ."

While Rio may receive a smaller royalty payment under an election made by the Audrey group, that result is clearly contemplated by the terms of the Audrey lease. The cotenants still share proportionally in the royalty payments made pursuant to the Audrey lease, i.e., 4% of the value of yellowcake is distributed one–fourth (or 1%) to Rio and three–fourths (or 3%) to the Audreys.

Rio analogizes its "nonvoting" status to the position of an owner of nonvoting corporate stock, who, though precluded from voting, retains property interests in the stock which should be protected by those who own voting shares. Rio contends it was illegally deprived of the potential benefits of the annual option being permanently waived by the Audreys. Rio's position is that the Audreys were not entitled to sell that option right without the consent of all lessors, including Rio.

■ The analogy to nonvoting stockholders does not hold. Generally, owners of voting corporate stock have the right to vote their stock as they please and are not obligated to defer to the interests of minority stockholders. Majority stockholders are subject only to the restriction that they may not vote their stock for the purpose of oppressing or defrauding the minority stockholders. *Ritchie v. McGrath*, 1 Kan. App.2d 481, 571 P.2d 17 (1977); 5 Fletcher,

---

7. The royalties payable by Rio have not been increased or made subject to a formula different from that provided by the lease. Nor has Rio's share of royalty payments been altered, although 2.5% of the royalties due the Jimcos have been assigned to the Audreys.

*Cyclopedia of the Law of Corporations* § 2025 (1976). But there is no oppressive or fraudulent conduct in the defendant's ignoring the interest of Rio after Rio had expressly disclaimed the right to vote on a matter where there was an obvious conflict of interest and where recognition of the power to vote would have given a veto power over the choice of the manner of determining royalty payments.

 Rio contends that the settlement stipulation breaches an implied covenant of good faith. It is fundamental that, whether expressed or not, every contract includes a covenant of good faith with respect to dealings between the parties. The parties to a contract must deal fairly and honestly with each other. *Fischer v. Johnson*, Utah, 525 P.2d 45 (1974); *Flying Tiger Line, Inc. v. United States Aircoach*, 51 Cal.2d 199, 331 P.2d 37 (1958); *3 Corbin on Contracts* § 541 (1960). A court will not, however, make a better contract for the parties than they have made for themselves. *J. R. Simplot Co. v. Chambers*, 82 Idaho 104, 350 P.2d 211 (1960). An express agreement or covenant relating to a specific contract right excludes the possibility of an implied covenant of a different or contradictory nature. *Brimmer v. Union Oil Co. of California*, 81 F.2d 437 (10th Cir. 1936); *Hartman Ranch Co. v. Associated Oil Co.*, 10 Cal.2d 232, 73 P.2d 1163 (1937); 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 12 (1965). Because of Rio's dual role, the Audreys were not required to subordinate their own interests to Rio's in making their election. A duty of good faith does not mean that a party vested with a clear right is obligated to exercise that right to its own detriment for the purpose of benefiting another party to the contract. A court will not enforce asserted rights that are not supported by the contract itself. *In re Cohen's Estate*, 23 Ill.App.2d 411, 163 N.E.2d 533 (1960).

 It may be true that a royalty based on the value of yellowcake could result in a lesser total royalty payment under the headlease and that the 2.5% payment to the Audreys under the Jimco agreement would increase the Audreys' total receipts without Rio's participating in the augmented amount as it would do if the larger amount were paid under the terms of the Audrey lease, but the settlement agreement had a valid purpose, and we are not able to conclude that the 2.5% payment to the Audreys (and excluding Rio) constituted bad faith or an effort to exclude Rio from its rightful share of the royalties. Had the Jimcos agreed to pay a lump sum to the Audreys in return for the Audreys' agreement to exercise its election in a particular manner, it seems even plainer that Rio would not be entitled to participate in the lump sum. Yet the two situations are essentially comparable.

The clear implication of the election provision was that the Audreys had the right to exercise that right in their own self-interest. The settlement stipulation does not deprive Rio of royalties to which it is entitled under the terms of the Audrey lease. The Audreys waived their right to revoke their royalty election to settle lengthy and costly litigation over the disposition of royalty payments. The consideration paid to them was not for an interest in mining claims or other property in which Rio was a co-owner with the Audreys. There is no evidence of bad faith on the Audreys' part.

In settlement of a costly and time-consuming legal dispute, the Audreys relinquished an option they alone had the right to assert in exchange for an assignment of a portion of royalties payable to the Jimcos. The Audreys had the right to bargain with respect to their exclusive option, and the Jimcos' right to make an assignment of royalties to the Audreys in return for relinquishing a legal right is beyond dispute. There is no greater royalty burden placed upon Rio as lessee. Its payments to the Jimcos are payable only after the Audreys and Rio as cotenants have received the payments due them. The royalty ceiling agreed to in the Jimco lease remains the same.

 Rio's ¼ undivided ownership interest in the mineral claims stands apart from the option election vested in the Audreys. The Audreys' agreement to exercise the

option in a particular manner was for the purpose of settling litigation between them and the Jimcos. It is basic that the law favors settlements of disputes, *Tracy–Collins Bank & Trust Co. v. Travelstead*, Utah, 592 P.2d 605 (1979); *Williams v. First National Bank of Pauls Valley*, 216 U.S. 582, 30 S.Ct. 441, 54 L.Ed. 625 (1910); and under the circumstances of this case in which the approval of the trial court was a necessary predicate of the settlement, we are not able to perceive any element of bad faith.

Rio argues further that it is an intended beneficiary of the election provision of the amended Audrey lease, even though exercised by others, because it participates in the outcome of the royalty election, and that those holding the power of election are obligated to exercise that power to protect Rio's interests. Rio cites as authority cases dealing with the question of the right of one not a party to an agreement to enforce rights under that agreement as a third–party beneficiary, viz., *Montgomery v. Rief, Spencer and Dee*, 15 Utah 495, 50 P. 623 (1897); *Manning v. Wiscombe*, 498 F.2d 1311 (10th Cir. 1974); and *Hamill v. Maryland Cas. Co.*, 209 F.2d 338 (10th Cir. 1954).

■ However, the argument is not sound. Third–party beneficiaries are "persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration," 4 *Corbin on Contracts* § 774 at 6 (1960). See *Mason v. Tooele City*, 26 Utah 2d 6, 484 P.2d 153 (1971). For a third–party beneficiary to have a right to enforce a right, the intention of the contracting parties to confer a separate and distinct benefit upon the third party must be clear. *Clark v. American Standard, Inc.*, Utah, 583 P.2d 618 (1978). A third–party beneficiary who is incidentally benefited may not recover. *Montgomery v. Rief, et al., supra; California Cotton Oil Corp. v. Rabb*, 88 Ariz. 375, 357 P.2d 126 (1960). There is nothing in the Audrey lease which indicates any intention on the part of the contracting parties to confer upon Rio any right to control the exercise of the option or to have it exercised in favor of Rio's self–interest; indeed, the contract evidences the exact opposite intent. Certainly Rio is entitled to no greater rights, even viewing it as a third–party beneficiary, than it has as an actual party. *Continental Bank & Trust Co. v. Stewart*, 4 Utah 2d 228, 291 P.2d 890 (1955).

Rio also contends that the Audrey defendants, in entering into the settlement agreement with the Jimcos, breached fiduciary duties owed to Rio. Those duties are asserted to exist both by reason of the status of Rio and the Audreys as cotenants of the subject uranium claims and because of the effects upon Rio of the exercise of the Audreys' option election.

■ In some situations a fiduciary relationship may exist between tenants in common. But the mere fact of cotenancy alone does not create such a relationship. 4A *Powell on Real Property* § 605 at 619 (1979). In *Pure Oil Co. v. Byrnes*, 388 Ill. 26, 57 N.E.2d 356, 361 (1944), the court held that a fiduciary relationship existed between the parties, but stated:

A fiduciary relationship did not arise merely from the fact that appellant and appellee were tenants in common.... Ordinarily one tenant in common may deal with a cotenant respecting the common property. *Albrecht v. Hunecke*, 196 Ill. 127, 63 N.E. 616, 618. But this court, in the case just cited, said: "The question whether there is a fiduciary relation between such parties, so that confidence is reposed by one in the other, will depend upon all the facts and circumstances of the particular case."

■ A fiduciary relationship between cotenants is usually found when one cotenant of real property undertakes to act on behalf of another cotenant or takes advantage of other cotenants, often in the course of acquiring paramount title or ousting other cotenants. In *Britton v. Green*, 325 F.2d 377 (10th Cir. 1963), one cotenant agreed to become the operating agent for others to "exploit the co–tenancy for their mutual profit." The court held that the cotenant with a right to possess the property owed fiduciary duties to its cotenants not in possession.

Rio argues that *Britton* is applicable to this case, but the facts are distinguishable. In *Britton* the court stated:

> It is agreed that seller shall have active charge of the operation of said leasehold estate, and that *said premises shall be operated to the mutual interest of all parties hereto* as economically as good business judgment will warrant. It is further agreed that *the parties hereto will observe the spirit as well as the strict letter of this contract and work at all times to the mutual advantage of each other* in the management and operation and development of said lease. 325 F.2d at 381 n. 2. [Emphasis added.]

 In contrast, recognition of an obligation on the part of the Audrey defendants to exercise their contractual election right in the best interests of Rio would be at odds with the purpose for, and intent of, Paragraph 21.3 of the Audrey lease. That provision expressly vests the royalty election solely in the Audreys and excludes Rio from any decision in that election. The obvious purpose was to prevent, at the least, conflict, and at the worst, injury to the Audreys, because of Rio's conflict of interest. The amended Audrey lease was not designed to give Rio the best possible of all worlds which might result from Rio's status as a recipient of the same royalties which Rio itself paid, a possibility that existed because Rio paid and received those royalties in different proportions. The parties foresightedly dealt with this conflict when the Audrey lease was executed. In short, we hold that the Audreys owed no fiduciary duty to Rio with respect to the election option.

 Rio's final argument is that the trial court erred in dismissing its amended complaint for failure to state a cause of action. The amended complaint based its claims both on Rio's asserted contractual rights and the cotenancy status of Rio and the Audreys. Rio argues that the trial court should have allowed it to conduct discovery and present evidence on its claims of breach of fiduciary duties.

Neither the amended Audrey lease nor the nature of the relationship between Rio and the Audreys imposed fiduciary duties upon the Audreys in their dealings with Rio beyond an implied covenant to exercise their contractual rights in good faith. Since the settlement stipulation was not in violation of Rio's contractual rights or of any fiduciary duty, the amended complaint was properly dismissed.

In sum, we affirm the trial court's order sustaining the validity of the Jimco–Audrey settlement stipulation.

Costs to Respondents.

CROCKETT, C. J., and MAUGHAN, WILKINS and HALL, JJ., concur.