*In re* ESTATE OF SHIRLEY LILLY, Deceased.—(GROVER LILLY *et al.,* Petitioners-Appellants, *v.* STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Respondent-Appellee.)

Second District (2nd Division)   No. 75-357

Opinion filed August 31, 1976.

William T. Cacciatore and Robert J. Shaw, both of Rockford, for appellants.

Gilbert & Powers, of Rockford, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:
This is an appeal from the denial of a petition to vacate and set aside the order of the probate court approving a wrongful death settlement.

Shirley Lilly, 20 years of age, was killed in Winnebago County while riding as a passenger in an automobile. The driver of the other automobile

involved was insured against personal injury liability by State Farm Mutual Automobile Insurance Company.

Grover and Mildred Lilly, the parents of Shirley, are poor blacks, residing in Alabama. Mr. Lilly testified he went only through first grade in school, Mrs. Lilly that she went through the twelfth grade. After Shirley's funeral the Lillys boarded a bus and came to Rockford to the home of Mrs. Lilly's sister. They then contacted one Gordon Greeny, an adjuster for State Farm. They discussed a settlement of their wrongful death claim for the death of Shirley. Greeny first offered them $9,000 in settlement. The Lillys declined this offer and said they would get a lawyer. That same day, Mr. Lilly became ill and had to go to a hospital. While Mr. Lilly was in the hospital Greeny continued the negotiations with Mrs. Lilly. There is some discrepancy between Mrs. Lilly's testimony and Greeny's as to their negotiations while Mr. Lilly was in the hospital. Mrs. Lilly says Greeny showed her a "book" with references to cases in it, which, he stated to her, indicated that $13,500 was all the case was worth, based on the fact that Shirley was single and without children (these figures being apparently based on a wrongful death case). He showed her some other cases, one of them indicating a higher settlement than $13,500 but said $13,500 was all they could get since Shirley was not a "bread winner." Mrs. Lilly testified she said that was too little and she would see a lawyer, to which Greeny allegedly replied that if she did she "wouldn't get that much" because of court costs and lawyers' fees. She said that Greeny told her she "couldn't get anymore than that."

Mr. Lilly also testified that when he went to see Greeny, before he became sick and went to the hospital, Greeny had referred to a "big, black book" and told him that $13,500 "was the most for my daughter's death," and that "he didn't pay any higher.' On this occasion the offer was turned down by Mr. Lilly.

Greeny stated that he had started at about $9,000 as a settlement figure and had discussed the case with his superiors and they had authorized a top settlement figure of $13,500. Greeny admitted he had shown Mrs. Lilly some data on previous cases from Illinois Jury Verdicts' Reports; that some of these decisions went back 12 to 18 years and that he had discussed with Mrs. Lilly some verdicts involving minors, although he knew Shirley was not a minor at the time of her death. He stated that he had pointed out in one specific case where the verdict was $65,000, however, that that involved a nurse with three children. He denied telling Mrs. Lilly that $13,500 was the maximum the Lillys could get but said he had told them that was all he would pay. He stated further that the Lillys had indicated to him that Shirley was not contributing to their support and in his opinion, based on a possible $20,000 to $22,000 verdict, if the case was tried, it was only worth $13,500 for settlement purposes. The

Lillys, on the other hand, testified that Shirley sent them small amounts of money each month and that she frequently sent clothes for the other children.

Following Greeny's second telephone conversation with Mrs. Lilly she apparently communicated to Mr. Lilly that $13,500 was the highest offer she had received. The day he was released from the hospital, May 6, Mr. Lilly called Greeny and told him that he was sick and had to get back to Birmingham and that he would accept the settlement offer of $13,500. The Lillys did not consult with an attorney before making this decision.

It is evident from the testimony that the Lillys, having become reconciled to the fact that the settlement of $13,500 was all they could hope to get, were very anxious to complete the transaction and return to their home in Alabama. Greeny testified that when they agreed to settle they indicated they wanted an immediate settlement and wanted to leave for Alabama that day on the bus. He, therefore, called attorney Gilbert, whose partner, Powers (who was away at the time), represented State Farm in this particular case, and asked Gilbert if he would arrange an immediate settlement in probate, which would, of course, involve opening up an estate. Gilbert testified that he received this telephone call about 2 in the afternoon and realizing that it would require court approval he called Judge Forbes, the probate judge, and asked him if he would mind waiting in his chambers in order to go over a wrongful death settlement, since the people involved were very anxious to get the money and start back to Alabama that day. Whether the Lillys went to attorney Gilbert's office in Mrs. Lilly's brother's car or were "rushed" to the attorney's office in Greeny's car is a point in dispute. However, the brother did accompany the Lillys and Greeny to Gilbert's office. Gilbert testified that after he examined the file he told Mrs. Lilly that a local resident was needed to act as administrator of the estate to be opened up in the wrongful death action. He testified that he suggested to Mr. Lilly that since he could not act, being a resident of Alabama, a relative should act as administrator and he suggested Mrs. Lilly's brother, who had accompanied them and was waiting in the ante-room. However, Mr. Lilly said he did not wish Mr. Harris, his brother-in-law to act as administrator and he inquired of Mr. Gilbert if he could not act in that capacity.

Mr. Lilly denied in his testimony that Gilbert suggested that he have his brother-in-law act as administrator.

In any event, attorney Gilbert did (for their convenience, he testified) prepare papers petitioning to have himself appointed as administrator in the wrongful death action and the parties then proceeded to Judge Forbes' chambers. It was then about 4 to 4:30 in the afternoon. When Judge Forbes examined the papers and noted that Shirley had brothers and sisters who were minors he realized that a guardian ad litem was

required. He, therefore, sent for an Assistant State's Attorney by the name of McWilliams and requested that he act as guardian ad litem for the minor children. Mr. McWilliams testified that he did not realize when he entered Judge Forbes' chambers that attorney Gilbert had any relationship to the case other than as administrator of the estate of Shirley Lilly. He therefore was perfunctory in his questioning as to the case and the settlement. At that time, he says, he did not realize that Glbert was a member of the firm which was defending State Farm in the wrongful death action. He did not recall that Gilbert ever informed him of that fact. Had he realized that, he testified, he would have engaged in greater conversation with the two black people and "would have established in greater detail the actual liability in this situation, the young woman's income and the contributions the young woman gave to the parents." Attorney Gilbert testified he believed he did tell Mr. McWilliams he was retained by State Farm which was the reason for asking McWilliams to act as guardian ad litem. However, he did not discuss the facts of the accident nor the terms of the settlement with McWilliams. Naturally, he did not discuss the adequacy of the settlement with him.

The Lillys testified they were not informed and did not realize that Gilbert represented State Farm; they did not understand he represented any other interest than theirs. The insurance company paid attorney Gilbert's fee of $60 for drawing up the probate papers and submitting them to the court for approval.

The court reporter's notes showed no formal testimony was taken in the judge's chambers except as to proof of heirship. Judge Forbes summed up what occurred from his own memory. (Whether or not this is properly a part of the record since it was not recorded, thus properly not reconstructable, we need not decide in view of the decision we reach herein.) Judge Forbes' recollection was that he told the Lillys that Gilbert represented the insurance company and that he appointed McWilliams to act as guardian ad litem with a view to preventing a conflict of interest; that he talked with the Lillys and explained to them that if they accepted this settlement that was all they could get and they replied they understood that. He recalled that the Lillys were so anxious to get the money and get started back to Alabama that they started to leave before he had finished talking with them and attorney Gilbert had to go after them and bring them back.

It is suggested by the plaintiffs that the settlement was tainted with actual fraud due to the misrepresentation of the adjuster, Greeny, to the effect that $13,500 was the maximum payable as a wrongful death settlement under the particular circumstances of this case. It was not, however, established that such representation was actually made by Greeny. Greeny testified he merely told them it was a good settlement

and it was all he was authorized to offer, having in mind that the Lillys had told him Shirley was not contributing to their support.

■■ An adjuster and a claimant deal at arms length and an inadequate settlement effected by an insurance adjuster in a wrongful death case does not indicate fraud in and of itself. The cases cited by plaintiffs' counsel such as *Scheffki v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.* (1971), 1 Ill. App. 3d 557, and *In re Williams* (1974), 57 Ill. 2d 63, were both flagrant cases of unethical conduct by an attorney. *Scheffki* was a personal injury case where a minor boy suffered the loss of both legs in a railroad accident. The attorney who purported to represent him was actually a railroad attorney selected by the defendant railroad and introduced to the boy's father by the railroad claims' adjuster. He induced the father to inform the court that he [the father] thought the proposed settlement of $15,000 was a good settlement. Here there was both concealment as to the attorney's real interest and a shockingly inadequate settlement—this combination of factors suggests actual fraud. Moreover, the advantage taken was directly against the injured minor. *In re Williams* involved a disciplinary action by the Board of Governors where the attorney in question made use of confidential information received from a client to assist an adverse party whom he subsequently represented. This, of course, was not a mere formal impropriety but was an actual breach of trust which gave one party an undue advantage over the other.

In the case at hand there was no devious concealment or breach of trust by an attorney or anyone else chargeable with a conflict of interest. We feel, therefore, that the general language cited by the plaintiffs from such cases as *Scheffki* and *Williams* is not applicable here. The conflict of interest appears to have been fortuitous rather than deliberate so far as attorney Gilbert was concerned. While McWilliams, the guardian ad litem, apparently assumed that Gilbert's relationship to the case was strictly that of administrator for the estate and did not realize Gilbert's firm represented the insurance company, there is no evidence that there was any attempt at concealment of that fact by Gilbert and it was, of course, well known to the court. We make this point at some length because we believe justice requires that no suggestion of fraud, concealment or other morally questionable conduct be imputed to either attorney Gilbert or Judge Forbes. Actually, we are convinced that both were acting in a kindly spirit to override technicalities and not in any sense to take advantage of the Lillys but rather to assist them. This conclusion is evident from the record.

■■ Yet, there is an impropriety here which cannot be blinked at. Even conceding the motive was innocent, the conduct of the State Farm lawyer in acting as administrator of the decedent's estate and submitting the claim of the next of kin to the probate court for approval is a clear

impropriety. Moreover, when the formal technical impropriety of the attorney is combined with the possible misunderstanding as to the value of the claim induced by the adjuster, the effect is still more dubious. The Lillys were poor, little educated and in a strange city, far from home. While there is no evidence they were coerced in any way, they were dealing without an attorney, partly at least through the inducement of the adjuster. McWilliams testified he was not aware that Gilbert was representing State Farm. It is logical to suppose that he did not understand this, since it is unusual for a member of a firm reprsenting an insurance company in a wrongful death action to also act as administrator of the estate in that wrongful death action. Had McWilliams known Gilbert's actual relationship to the case, he might, on behalf of the minors at least, have demanded a higher settlement. Thus, Gilbert's technical impropriety in representing two (at least technically) opposing points of view, coupled with the possibly misleading tactics of the adjuster, resulted in muddying the waters surrounding the settlement to an extent we cannot ignore. Had Gilbert suggested that it was not proper for him to act as administrator the result might have been to engage another attorney whose sympathies were with the Lillys rather than with the insurance company. The result may have been a higher settlement for the Lillys. While it does not appear that attorney Gilbert in any way attempted to take advantage of his role as administrator of the estate, certainly his role as such short circuited a further evaluation of the claim before the settlement was submitted to the court. The settlement submitted and approved was, to say the least, modest by current standards for a wrongful death action and it is entirely possible the insurance company would have paid more if pressed by an attorney. See the recent case of *Baird v. Chicago, Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 471, where our Supreme Court, quoting from *Howlett v. Doglio*, 402 Ill. 311, 316, said:

> "'[I]f the next of kin are lineal kinsmen of the deceased, a presumption of pecuniary loss obtains from the relationship, alone, suficient to sustain a verdict and judgment awarding substantial damages, without proof of actual loss."

Even granting, therefore, that there was no concealment of the dual representation and the conflict of interest was not of a fraudulent nature it nevertheless created an impermissible situation. As was said in the *Scheffki* case:

> "It is a firmly established rule, in this jurisdiction and in others, that a lawyer cannot represent conflicting interests nor undertake to discharge inconsistent duties, no matter how honest his motives or intentions. [Citation.] The rule is a rigid one. It is designed to prevent not only the dishonest practitioner from fraudulent

conduct, but to preclude the honest practitioner from putting himself where he must choose between reconciling conflicting interests and protecting rights which he should represent." 1 Ill. App. 3d 557, 562.

The great disparity in bargaining power between the parties in this case reinforces the general rule and we are constrained to regard the impropriety of attorney Gilbert's dual role as serious enough to avoid the settlement in this case.

■■ The petition to vacate the settlement, however, is addressed to the conscience of the court and thus involves. its equity powers. The proceeding being an equitable one, it is subject to the maxims of equity, one of which is that he who seeks equity is bound to do equity. Under the cicumstances of this case we hold that to follow the equitable maxim and do equity to the defendant the plaintiffs should return to the defendant the proceeds of the settlement in the amount of $13,500 and this is a condition precedent to the granting of the equitable relief prayed for by the plaintiffs. This court has the power to impose such a condition to the granting of plaintiffs' petition. (See *Pure Oil Co. v. Brynes* (1944), 388 Ill. 26; *Durfee v. Murray* (1880), 7 Ill. App. 213; *Starrett v. Keatig* (1895), 61 Ill. App. 189.) In the *Starrett* case the court observed:

"And it is a familiar rule that as he who asks equity must do equity, a complainant seeking to rescind a transaction for fraud is required to put the defendant in *statu quo*, unless prevented by some cause for which he is not responsible." (61 Ill. App. 189, 196.)

There is, of course, no such cause here and the application of this familiar principle requires that the *status quo* be restored as a condition precedent to equitable relief. Accordingly, we make this a condition of the judgment herein granted.

The judgment of the trial court of Winnebago County is reversed and the case is remanded with instructions to vacate the approval of the settlement order, conditioned, however, upon the plaintiffs first returning in full to the defendant the proceeds of the original settlement in the amount of $13,500.

Reversed and remanded with instructions.

DIXON and SEIDENFELD, JJ., concur.